**E.I. DuPONT de NEMOURS & COMPANY, Plaintiff,**

v.

**PHILLIPS PETROLEUM COMPANY, Phillips 66 Company, and Phillips Driscopipe, Inc., Defendants.**

**Civ. A. No. 81–508–JLL.**

United States District Court, D. Delaware.

March 6, 1989.

Order on Consent March 21, 1989.

John O. Tramontine, Edward F. Mullowney, Glenn A. Ousterhout and Thomas J. Vetter of Fish & Neave, New York City, of counsel, for plaintiff.

C. Waggaman Berl, Jr., Wilmington, Del., and Harry J. Roper, George S. Bosy, Raymond N. Nimrod, and Steven R. Trybus of Neuman, Williams, Anderson & Olson, Chicago, Ill., Philip S. Beck and Philip C. Swain of Kirkland & Ellis, Chicago, Ill., of counsel, for defendants.

## OPINION

LATCHUM, Senior District Judge.

### I. INTRODUCTION

This patent infringement action is on remand from the Court Of Appeals for the Federal Circuit (the "Federal Circuit") in accordance with its June 15, 1988 opinion, *E.I. duPont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430 (Fed.Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 542, 102 L.Ed.2d 572 (1988). The Federal Circuit affirmed in part, reversed in part, and vacated in part this Court's judgment after trial which held that Claims 1, 2, 5, 10, 12 and 14 of the patent in suit, U.S. Serial No. 4,076,698 (the " '698" patent), were not proved invalid and were infringed.[1]

The case has been remanded for reconsideration of the validity and infringement of Claims 1 and 12 of the '698 patent. More particularly, this Court must now consider whether defendant ("Phillips")[2] has proved that Claims 1 and 12 as defined by the Federal Circuit are invalid, and if not whether plaintiff ("DuPont") has proved infringement by Phillips of Claims 1 and 12 as defined on remand.

### II. THE FEDERAL CIRCUIT'S OPINION

The '698 patent relates, generally, to copolymers of ethylene and higher alpha-ole-

William O. La Motte, III of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., and

---

1. For this Court's opinion after trial, see *E.I. duPont de Nemours & Co. v. Phillips Petroleum Co.*, 656 F.Supp. 1343 (D.Del.1987), *rev'd in part*, 849 F.2d 1430 (Fed.Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 542, 102 L.Ed.2d 572 (1988).

2. The Court will use the designation "Phillips" to refer to the defendants in this case, viz: Phillips Petroleum Company; Phillips 66 Company; and, Phillips Driscopipe, Inc., unless indicated otherwise.

fins.[3] This Court previously held that Phillips had not made out its defense of invalidity, and had infringed Claims 1, 2, 5, 10, 12 and 14 of the patent by making and selling approximately 80 copolymer resins or products made from the resins. *See DuPont,* 656 F.Supp. at 1392.

On appeal the Federal Circuit held that it was legal error for this Court to have interpreted the claims of the patent to include two limitations which were disclosed in the specification but not expressly written into the claims. *DuPont,* 849 F.2d at 1434. The two improperly included limitations were "superior environmental stress crack resistance" and "superior impact strength." *Id.* at 1433. Interpreting the claims without these limitations, the Federal Circuit held that Claims 2, 5, 10 and 14 were invalid as anticipated under 35 U.S.C. § 102(g) ("§ 102(g)"), because DuPont conceded at trial that certain copolymers made by Phillips in this country before the date of DuPont's invention (the "Witt and Leatherman products") satisfied the remaining limitations of those claims. *Id.* & n. 3.

However, the Federal Circuit concluded that Claims 1 and 12 each had a limitation which DuPont did not concede was satisfied by the Witt and Leatherman products. *Id.* at 1434. Therefore, Claims 1 and 12 were remanded with instructions for this Court to address their validity and infringement without the improperly included limitations. *Id.*

## A. *Validity of Claims 1 and 12*

The Federal Circuit ruled that to find anticipation of Claims 1 and 12 under

§ 102(g), this Court must determine that Phillips has proved by clear and convincing evidence that the Witt and Leatherman products satisfied the express limitations of Claims 1 and 12 which were not conceded by DuPont. *Id.* at 1435. The express limitations which were not conceded are "an Elmendorf tear strength in the range of 150 to 400 grams per mil," ("Elmendorf tear strength") in Claim 1, and impact strength in terms of "hoop stress of 750 psi" at 60°C. for 3000 hours ("hoop stress resistance") in Claim 12. *Id.* at 1434–35.[4]

The Federal Circuit also found that it was improper for this Court to have not considered certain notebook data presented at trial on the issue of anticipation under § 102(g). *Id.* Therefore, on remand Phillips is entitled to rely on the Witt and Leatherman U.S. and foreign patent applications, as well as the notebook data it presented at trial. *Id.* It need not prove that Witt and Leatherman were aware that their products possessed the properties embodied by the limitations of Claims 1 and 12. *Id.*

The Federal Circuit also concluded that it was appropriate for this Court to reassess the nonobviousness of Claims 1 and 12 under 35 U.S.C. § 103 ("§ 103") without the improperly included limitations, and provided guidance with respect to the "scope and content of prior art." *Id.* The Federal Circuit held that the prior work of another under § 102(g), except as qualified by § 103 with respect to certain commonly owned subject matter,[5] can be used as § 103 prior art so long as it has not been abandoned, suppressed, or concealed. *Id.* at 1436–37. However, the Federal Circuit apparently concluded that DuPont con-

---

**3.** For a further recitation of the technology of the '698 patent, see *DuPont,* 849 F.2d at 1431–32, and *DuPont,* 656 F.Supp. at 1346–52.

**4.** The Federal Circuit ruled that this Court correctly regarded the claimed invention "as compositions that can be permissibly defined in terms of structure *and properties." DuPont,* 849 F.2d at 1435–36 (emphasis added). *Cf. Perkin-Elmer Corp. v. Westinghouse Electric Corp.,* 822 F.2d 1528, 1533 n. 9 (Fed.Cir.1987) ("a limitation may include descriptive terms").

**5.** On November 8, 1984, Congress enacted an amended version of 35 U.S.C. § 103 which provided in part that:

Subject matter developed by another person, which qualifies as prior art only under subsection (f) or (g) of section 102 of this title, shall not preclude patentability under this section where the subject matter and the claimed invention were, at the time the invention was made, owned by the same person or subject to an obligation of assignment to the same person.

35 U.S.C. § 103 (as amended Nov. 8, 1984, Pub.L. 98–622, Title I, § 103, 98 Stat. 3384.).

ceded that the Witt and Leatherman products were not abandoned, suppressed or concealed. *Id.* at 1436–37 n. 5. Therefore, the Witt and Leatherman products will be considered as § 103 prior art on remand.

### B. *Infringement of Claims 1 and 12*

The Federal Circuit has directed this Court to ascertain the meaning of a density of "0.95" and a crystallinity of "70%" as these terms are used in Claims 1 and 12, and if necessary then to reassess infringement of Claims 1 and 12. *Id.* at 1439.[6] The Federal Circuit concluded that it appeared that this Court had disregarded statements made by DuPont during prosecution of the patent when interpreting the claims. *Id.* Therefore, the prosecution history of the patent, including arguments made during reissue/reexamination proceedings, are to be considered relevant in determining the meaning of the terms at issue on remand. *Id.* at 1438–39. Noted, particularly, were statements made by DuPont during prosecution of the '698 patent that certain densities and crystallinities were not within the claims. *Id.*[7]

If, in light of the prosecution history this Court decides to redefine density as 0.950 and crystallinity as 70% without variance, infringement must be reassessed under the doctrine of equivalents for the Phillips

products having a density over 0.950 or a crystallinity over 70%. *Id.* at 1439.[8]

### III. MOTION BY PHILLIPS ON REMAND

■ After some maneuvering by the parties,[9] this Court entered an order on November 7, 1988, concluding that the matters to be determined on remand could be performed properly from the present trial record taking into account all exhibits introduced and testimony presented at trial. (Docket Item ["D.I."] 302.) Notwithstanding this order, on December 7, 1988, Phillips moved for summary judgment on the invalidity of Claims 1 and 12, or in the alternative, for this Court to reopen the record and take certain additional evidence directed to the invalidity of Claims 1 and 12. (D.I. 305.) The Court will address this motion before turning squarely to the matters remanded.

### A. *Summary Judgment*

■ Phillips has moved for summary judgment under Rule 56, Fed.R.Civ.P., on the invalidity of Claims 1 and 12. (D.I. 305.) However, determination of whether Phillips has carried its burden of proving the invalidity of Claims 1 and 12 requires this Court to make further factual findings

---

6. As noted in Section IV.B., *infra,* the terms at issue are only contained in Claim 12.

7. The Federal Circuit noted that during prosecution of the '698 patent DuPont argued that densities of 0.954, 0.9547, 0.9557, and 0.9585 were not within the scope of the claims, *DuPont,* 849 F.2d at 1438, and that prior art polymers including those with a crystallinity of 32% and 38% were outside the scope of the claims. *Id.* at 1439. The Federal Circuit ruled that it was relevant with respect to the meaning of the crystallinity range that DuPont argued that something 2% off the lower limit of 40% is not within the claims, yet a variance of 10%–20% off the upper limit was. *Id.*

8. The Federal Circuit ruled that its instruction to reassess the definitions of density and crystallinity did not affect this Court's infringement determination that was unchallenged on appeal for the infringing Phillips products with a density below 0.950 *and* a crystallinity less than 70%. *DuPont,* 849 F.2d at 1439.

9. Since the Federal Circuit's mandate was issued in this case the parties have attempted to coun-

sel this Court with respect to its handling of the remand proceedings. The "fly in the ointment" has been the ongoing effort by Phillips to convince the United States Patent and Trademark Office to reexamine the '698 patent. (*See* D.I. 291 through 301.) Phillips urges this Court to stay its hand pending the outcome of the Patent Office proceedings, while DuPont opposes a stay. However, while the inability of the Patent Office to stay its proceedings may not optimally serve the end of judicial economy, this Court has exercised its inherent discretion to proceed and not stay the remand proceedings. *See Gould v. Control Laser Corp.,* 705 F.2d 1340, 1341 (Fed.Cir.), *cert denied,* 464 U.S. 935, 104 S.Ct. 343, 78 L.Ed.2d 310 (1983). *Cf. Ethicon, Inc. v. Quigg,* 849 F.2d 1422, 1426 (Fed.Cir. 1988). Where such a stay could result in a tactical advantage to one party or the other, this Court will not employ its discretion to stay the ordinary course of its proceedings simply because the outcome of the Patent Office proceedings *may* moot the issues remanded.

from the record. *See DuPont,* 849 F.2d at 1435, 1436.[10] These findings will not be made on a motion for summary judgment. *See DeLong Corp. v. Raymond Int'l, Inc.,* 622 F.2d 1135, 1138 n. 2 (3d Cir.1980); *Florham Park Chevron, Inc. v. Chevron U.S.A., Inc.,* 680 F.Supp. 159, 161 (D.N.J. 1988); *see also Shipley v. First Federal Savings & Loan Ass'n,* 703 F.Supp. 1122, 1125 (D.Del.1988). Therefore, Phillips' motion for summary judgment will be denied.

### B. *Reopen the Record*

■ As an alternative to summary judgment, Phillips has moved for this Court to reopen the record so that it may introduce additional evidence on the issue of whether the Witt and Leatherman products satisfied the limitations of Claims 1 and 12. (D.I. 305.) The evidence consists of three affidavits which Phillips asserts "report reproductions of the Witt and Leatherman ethylene-hexene copolymers" and evaluations of the reproductions. (D.I. 306 at 2.) Phillips argues that admission of this evidence is required by the Federal Circuit's mandate in this case, and by the controlling authorities. (D.I. 306 at 8.)

This Court reads neither the Federal Circuit's mandate nor controlling authority as requiring the record to be reopened in this case.[11] While the Federal Circuit did rule that Phillips can rely on the notebook data presented at trial, *DuPont,* 849 F.2d at 1436, it did not direct this Court to take additional evidence.[12] The Federal Circuit's failure to specifically direct the taking of additional evidence can, "at most," be construed as leaving the matter to the sound discretion of this Court. *Skehan v. Board of Trustees of Bloomsburg State College,* 590 F.2d 470, 478 (3d Cir.1978), *cert. denied,* 444 U.S. 832, 100 S.Ct. 61, 62 L.Ed.2d 41 (1979); *accord Hartford Accident and Indemnity Co. v. Gulf Ins. Co.,* 837 F.2d 767, 773 (7th Cir.1988); *see also Adelson v. United States,* 782 F.2d 1010, 1012 (Fed.Cir.1986); *Noble v. National Mines Corp.,* 774 F.2d 144, 149 (6th Cir. 1985); *Air Et Chaleur, S.A. v. Janeway,* 757 F.2d 489, 495 (2d Cir.1985); *Spring Mills, Inc. v. Ultracashmere House, Ltd.,* 724 F.2d 352, 355 (2d Cir.1983); *Pittsburgh Press Club v. United States,* 579 F.2d 751, 755 (3d Cir.1978); *Rochez Bros., Inc. v. Rhoades,* 527 F.2d 891, 894 n. 6 (3d Cir. 1975), *cert. denied,* 425 U.S. 993, 96 S.Ct. 2205, 48 L.Ed.2d 817 (1976). *Cf. Littlejohn v. BIC Corp.,* 851 F.2d 673, 686 (3d Cir. 1988) (whether to reopen discovery on remand is within trial court's discretion).

The Third Circuit has enumerated three factors which should concern this Court in the exercise of its discretion:[13] the burden that would be placed on the parties and witnesses by additional proceedings; whether "undue prejudice" may result by not taking additional evidence; and, whether taking additional evidence would unnecessarily drain judicial time and resources. *Pittsburgh Press Club,* 579 F.2d at 755; *see also Skehan,* 590 F.2d at 478; *Rochez Bros., Inc.,* 527 F.2d at 894 n. 6.

### 1. The Burden On The Parties And Witnesses

Phillips argues that the burden on the parties and their witnesses would be "small" because the evidence is limited and can be considered on a motion for summary judgment or "in a very short evidentiary hearing;" and because Phillips is going to

---

**10.** The Court will not consider the additional evidence submitted by Phillips in support of its motion for summary judgment. *See* Section III.B of this opinion, *infra.*

**11.** This is but one example of the overstatement employed by Phillips throughout these proceedings. The Court finds it difficult to conceive how counsel could posit that either the Federal Circuit's mandate in this case *or* the controlling authority *requires* admission of this evidence.

**12.** The Federal Circuit ruled that "any relevant evidence" may be used to make out an invalidity

defense under § 102(g); however the only evidence that the Federal Circuit found was improperly not considered was the notebook data which was, in any case, admitted at trial. *See DuPont,* 849 F.2d at 1436.

**13.** With respect to procedural matters in this case the Federal Circuit will look to the law of the Third Circuit. *Digital Equipment Corp. v. Emulex Corp.,* 805 F.2d 380, 382 n. 3 (Fed.Cir. 1986); *see also Newell Cos. v. Kenney Mfg. Co.,* 864 F.2d 757, 761 n. 1 (Fed.Cir.1988).

present this same evidence to the Patent Office during reexamination of the '698 patent.[14] (D.I. 306 at 11.)

The Court cannot concur with Phillips' view. However accurate Phillips' estimate may be with regard to the presentation of its own evidence, it hardly accounts for what DuPont may be required to do to address this evidence.

Phillips' evidence includes facts and opinions which would inject a myriad of *new* issues of both substance and credibility into the case, which DuPont would be entitled to address. Moreover, since the evidence involves reproductions rather than the Witt and Leatherman products themselves, the comparability of the reproductions would also be an issue. The Court assumes DuPont would be required to address each of these issues with discovery, preparation and marshalling experts of its own.[15] Calling on its experience in these matters, the Court concludes that allowing the additional evidence would place a great burden on DuPont and its witnesses, after having once tried the case.[16]

### 2. Undue Prejudice

Phillips argues that because it had the burden of proving the invalidity of Claims 1 and 12 at trial it "might be prejudiced if it is denied the right to introduce new evidence" now. (D.I. 306 at 11.) Phillips contends that because of certain statements made by DuPont's counsel during trial, "the only issue of fact on the validity side of the case" at trial was whether Witt and Leatherman recognized the superior properties of their products. (*Id.* at 11–12.)

As support for its argument, Phillips cites two excerpts from the trial transcript.[17] The first excerpt prefaced DuPont's "judicially binding admission" that Witt and Leatherman made certain copolymers satisfying the limitations of Claims 2, 5, 10 and 14 in this country before the date of DuPont's invention. (Transcript ["Tr."] at 1279); *see also DuPont*, 849 F.2d at 1434 & n. 3. DuPont's counsel stated: "I do this (*i.e.* make the "judicially binding admission"] to focus the case and to shorten it by making presentation of less pertinent evidence unnecessary." (Tr. at 1279.) The second excerpt was not part of the "admission."[18] There, DuPont's counsel stated that:

> [prior invention under 35 U.S.C. § 102(g)] would invalidate ... [the '698] patent if Witt and Leatherman made the discovery that the higher alpha olefins had superior stress crack and impact resistance to the butene copolymers or to free radical polyethylene. And they made the discovery before DuPont did. And, further, that they didn't—and this is in the words of the statute—they didn't abandon, suppress or conceal it.

(*Id.* at 1282.)

Phillips' argument is not convincing as a matter of law or fact. It is precisely because Phillips had the burden to prove invalidity at trial that its argument that it will be unduly prejudiced fails here.

▪ As a matter of law, neither of the excerpted statements made recognition by Witt and Leatherman the *only* issue of fact necessary for Phillips to prove the invalidity of Claims 1 and 12 at trial. Each claim of the '698 patent was presumed valid. 35 U.S.C. § 282. By asserting invalidity as a defense to infringement Phillips had to prove by clear and convincing evidence that

---

**14.** *See* note 9, *supra.*

**15.** DuPont has already expressed a need for additional discovery if the evidence is allowed. (D.I. 309 at 13.) *See Littlejohn v. BIC Corp.*, 851 F.2d 673, 686 (3d Cir.1988) (whether to reopen discovery on remand is within trial court's discretion).

**16.** Phillips' argument that it would not be burdensome because the parties will present the same evidence to the Patent Office (D.I. 306 at 11), is irrelevant to the Court's inquiry here, and is illogical. Phillips assumes the same evidence

will be presented to the Patent Office, and that presentation before this Court in addition to the Patent Office would not add to the burden on the parties and their witnesses.

**17.** Although Phillips cites the excerpts together, they are, in fact, 4 pages apart in the trial transcript.

**18.** DuPont's counsel was quite clear with regard to where the "judicially binding admission" ended, stating "That concludes the judicially binding admission." (Tr. at 1279–80.)

each of the claims asserted against it, including Claims 1 and 12, was invalid. *See American Hoist & Derrick Co. v. Sowa & Sons, Inc.*, 725 F.2d 1350, 1360 (Fed.Cir.), *cert. denied*, 469 U.S. 821, 105 S.Ct. 95, 83 L.Ed.2d 41 (1984); *DuPont*, 656 F.Supp. at 1354. Since DuPont did not concede the invalidity of Claims 1 and 12, *see DuPont*, 849 F.2d at 1434, Phillips had to adduce sufficient facts to establish their invalidity. *See ACS Hospital Systems, Inc. v. Montefiore Hospital*, 732 F.2d 1572, 1574–75 (Fed. Cir.1984).

■ DuPont's position that Witt and Leatherman had to recognize the superior properties of their products to invalidate the '698 patent under § 102(g) did not obviate the need for Phillips to prove that the Witt and Leatherman products were identical to the claimed interpolymers.[19] DuPont neither admitted that the Witt and Leatherman products were identical to the invention nor dictated the law of the case by stating its position at trial. *See Monroe v. United Air Lines, Inc.*, 736 F.2d 394, 408 (7th Cir.1984), *cert. denied*, 470 U.S. 1004, 105 S.Ct. 1356, 84 L.Ed.2d 378 (1985); *Glick v. White Motor Co.*, 458 F.2d 1287, 1291 (3d Cir.1972); *New Amsterdam Cas. Co. v. Waller*, 323 F.2d 20, 24 (4th Cir. 1963), *cert. denied*, 376 U.S. 963, 84 S.Ct. 1124, 11 L.Ed.2d 981 (1964); *Childs v. Franco*, 563 F.Supp. 290, 292 (E.D.Pa. 1983). *Cf. Jurinko v. Edwin L. Wiegand*

*Co.*, 477 F.2d 1038, 1045 (3d Cir.), *vacated*, 414 U.S. 970, 94 S.Ct. 293, 38 L.Ed.2d 214 (1973).

Phillips' argument is also factually flawed. It is apparently Phillips' position now that DuPont framed the issue of validity during trial such that Phillips was prevented from, or justifiably forewent, introducing evidence on the issue now before the Court.[20] But Phillips' position now is inconsistent with its actions taken after the allegedly "issue" framing activity of DuPont. It is clear that it was Phillips' position, both at trial and after, that DuPont's position was wrong as a matter of law, that Phillips did not have to show that Witt and Leatherman recognized the superior properties in order to invalidate the claims under § 102(g). (Tr. at 1285; D.I. 259 at 35.)[21] In fact, Phillips apparently concedes that it has continued to maintain that DuPont's position was wrong. (D.I. 310 at 3.) Furthermore, Phillips squarely addressed the issue in its post-trial brief, arguing that Claims 1 and 12, including the Elmendorf tear strength and hoop stress limitations at issue here, were fully met under § 102(g) by the Witt and Leatherman products. (D.I. 259 at 43–47.)

Therefore, Phillips' argument that it will be unduly prejudiced fails as well.

3. Drain On Judicial Resources

Phillips argues that there will be minimal use of judicial resources in taking the addi-

---

**19.** Identity of invention under § 102(g) required a showing that each limitation of the claims at issue was met by the Witt and Leatherman products. *Kalman v. Kimberly–Clark Corp.*, 713 F.2d 760, 771–72 (Fed.Cir.1983), *cert. denied*, 465 U.S. 1026, 104 S.Ct. 1284, 79 L.Ed.2d 687 (1984).

**20.** It is hardly prudent for a patent's challenger charged with infringement to allow the patentee to frame the case attacking the validity of the patent, particularly since the patentee, in this case DuPont, is not required to support the validity of the patent until the challenger, in this case Phillips, has first made out a prima facie case of invalidity. *See Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1534 (Fed.Cir.1983). Moreover, while the patentee may defeat a defense of invalidity by disproving one element of the challenger's case, *see Atlas Powder Co. v. E.I. duPont de Nemours & Co.*, 750 F.2d 1569, 1574 (Fed.Cir.1984); *see also Kloster Speedsteel AB v. Crucible, Inc.*, 793 F.2d 1565, 1571 (Fed.Cir. 1986), *cert. denied*, 479 U.S. 1034, 107 S.Ct. 882, 93 L.Ed.2d 836 (1987), the challenger must meet

its burden on all elements. *See Kalman*, 713 F.2d at 771.

**21.** Following DuPont's statement of its position that Witt and Leatherman had to recognize the superior properties of their products, Phillips' counsel stated:

But ... [whether the data shows that Witt and Leatherman recognized the superior properties of their products] aside, we feel that under 102(g), we [Phillips] don't have to show that Witt and Leatherman achieved any such recognition. I [Mr. Roper] think, really, the law is quite clear that what we have to show is they made it before their [DuPont's] invention which they [DuPont] now have admitted and we recognized it as a new product as something different than had been made before.... Indeed, I think that where a party is trying to prove up something as prior art, he doesn't have to go that far.

(Tr. at 1285.)

tional evidence because the amount of time necessary to consider it would be "quite short—on the order of two days;" and because if not considered here, it will "no doubt be considered in other forums" such as the Patent Office. (D.I. 306 at 14.) Phillips' argument here is similar to that advanced with respect to the "burden on the parties and their witnesses." *See* Section III.B.1. *supra.* The Court finds this argument equally unconvincing.

The Court is not convinced that Phillips' estimate of 2 days is an accurate one for Phillips to present the additional evidence and for DuPont to address it. Also, Phillips naively suggests that "taking" the evidence ends the drain on judicial resources. In fact, after "taking" the evidence the Court would have to consider it in view of the entire record, including the testimony given at the original trial. However, the Court would not have the benefit of having the additional evidence integrated into the original trial so it could be tested by the entire proceeding. Contrary to Phillips' suggestion, this would be a substantial drain on the resources of the Court.[22] All of this would be unnecessary because, for the reasons stated in Section III.B.2. *supra,* Phillips had a full opportunity to present this evidence at trial. Therefore,

the Court concludes that reopening the record would substantially and unnecessarily drain the resources of this Court.[23]

In the Court's view Phillips has asked for the record to be reopened so that it can introduce additional evidence on an issue squarely before the Court at trial and addressed by Phillips without restraint by the Court or DuPont.[24] Phillips was required to be reasonably alert at trial in the protection of its own interests. *Moylan v. Sicilano,* 292 F.2d 704, 705 (9th Cir.1961). It had a full and unrestrained opportunity to present evidence on whether Claims 1 and 12 were fully met by the Witt and Leatherman products.[25] If this presentation was inadequate, it was the fault of Phillips, not DuPont. *Cf. Skehan,* 590 F.2d at 478–79.

Accordingly, after considering the foregoing, Phillips' motion to reopen the record will be denied.

## IV. CONSIDERATION OF THE MATTERS REMANDED

The Court will now address the matters remanded by the Federal Circuit, specifically the validity and infringement of Claims 1 and 12 of the '698 patent. After carefully considering the sufficiency, weight and credibility of the evidence proffered by the

**22.** The trial in this case lasted 21 days, and generated 3,810 pages of transcript. Twenty-nine fact and expert witnesses testified, and 999 exhibits were introduced.

**23.** Likewise, if the Court was to essentially retry the case with the additional evidence, the substantial duplication of effort would lead to the same conclusion.

**24.** Ordinarily, a case is not remanded by an appellate court to give a party an opportunity to supplement the evidence presented at trial. *See Rochez Bros.,* 527 F.2d at 894; *accord Hartford Accident and Indemnity Co. v. Gulf Ins. Co.,* 837 F.2d 767, 774 (7th Cir.1988); *Moses Lake Homes, Inc. v. Grant County,* 276 F.2d 836, 853 (9th Cir.1960), *rev'd on other grounds,* 365 U.S. 744, 81 S.Ct. 870, 6 L.Ed.2d 66 (1961). *Cf. Air Et Chaleur, S.A. v. Janeway,* 757 F.2d 489, 495 (2d Cir.1985) (where appellant argued that the theory proposed by appellee at trial was a "surprise," court held "[o]nly 'reasonably genuine surprise' on the part of appellant ... combined with an assertion of the nature of the additional evi-

dence ... would give ... sufficient reason to remand for the taking of additional evidence"; appellant's argument of surprise found unconvincing.) While Phillips naturally would like to bolster its position now with its hindsight benefited by this Court's earlier opinion and that of the Federal Circuit, free permission of this practice would result in endless litigation. *See Ramsey v. United Mine Workers of America,* 481 F.2d 742, 753 (6th Cir.), *cert. denied,* 414 U.S. 1067, 94 S.Ct. 576, 38 L.Ed.2d 473 (1973); *see also United States v. Commonwealth of Virginia,* 454 F.Supp. 1077, 1096–97 n. 10 (E.D.Va.1978), *rev'd in part on other grounds,* 620 F.2d 1018 (4th Cir.), *cert. denied,* 449 U.S. 1021, 101 S.Ct. 589, 66 L.Ed.2d 483 (1980).

**25.** To the extent that this Court did not consider the "notebook data presented by Phillips" at trial, *see DuPont,* 849 F.2d 1436, Phillips was nonetheless permitted to introduce the evidence at trial and was in no way hindered in doing so by this Court or DuPont. *See United States v. Commonwealth of Virginia,* 88 F.R.D. 656, 665 (E.D.Va.1980).

parties at trial and their arguments,[26] the Court enters the following findings of fact and conclusions of law which are embodied in this opinion as permitted by Rule 52(a), Fed.R.Civ.P.

## A. *Validity of Claims 1 and 12*

Claims 1 and 12 are presumed valid, 35 U.S.C. § 282, and Phillips must prove facts to establish their invalidity by clear and convincing evidence. *Ethicon, Inc. v. Quigg*, 849 F.2d 1422, 1427 (Fed.Cir.1988); *see also American Hoist & Derrick*, 725 F.2d at 1360.[27]

### 1. Anticipation By The Witt And Leatherman Products Under § 102(g)

▆ To find anticipation this Court must determine that Phillips has proved by clear and convincing evidence that the Witt and Leatherman products had the Elmendorf tear strength and hoop stress resistance of Claims 1 and 12.[28] *DuPont*, 849 F.2d at 1435. Anticipation is a factual determination. *Lindemann Maschinenfabrik v.*

26. This Court's November 7, 1988 order established a briefing schedule on the matters remanded. (D.I. 302.) Briefing was completed on January 20, 1989.

27. Claims 1 and 12 are presumed valid independent of the Federal Circuit's determination that Claims 2, 5, 10, and 14 were invalid. *See Custom Accessories, Inc. v. Jeffery–Allan Indus., Inc.*, 807 F.2d 955, 961 (Fed.Cir.1986).

28. Claims 1 and 12 are reproduced in their entirety in Appendix A, along with Claim 5 from which Claim 12 depends.

29. Dr. Beasley is a recently retired polymer chemist with over 40 years' experience. He was employed by DuPont for the 35 years immediately preceding his retirement in 1986. (Tr. at 30–35.)

30. Phillips apparently concedes that it did not produce evidence at trial "focus[ing] precisely on the issues framed for remand," including whether the Witt and Leatherman products had the Elmendorf tear strength and hoop stress resistance of Claims 1 and 12. (D.I. 306 at 1–2.) It is noteworthy that in its post-trial brief, Phillips argued that although it did not test the Elmendorf tear strengths of the Witt and Leatherman products, it ran other tests measuring "other toughness properties, such as tensile strength and percent elongation ... which indicated that ... [the Witt and Leatherman products] were tough." (D.I. 259 at 44.) Curiously, environmental stress crack resistance was not

*American Hoist & Derrick Co.*, 730 F.2d 1452, 1458 (Fed.Cir.1984).

### a. *Elmendorf Tear Strength of Claim 1*

On the issue of whether the Witt and Leatherman products had the Elmendorf tear strength of Claim 1, Phillips proffers the laboratory notebook (DX 206) and testimony (Tr. 2732–33) of John N. Scott, a Phillips chemist, and certain testimony of Dr. John Knox Beasley, an expert called by DuPont (Tr. at 627).[29] Phillips argues that Dr. Beasley "admitted" that the Witt and Leatherman products would satisfy the limitations of the claims if the products were made "properly," and that the environmental stress crack resistance data contained in the Scott notebook show that they were. (D.I. 306 at 18.)[30]

The proferred testimony of Dr. Beasley was related to neither the Witt and Leatherman products nor prior invention under § 102(g).[31] Rather his testimony related to

included in this list. Dr. Beasley testified that "Izod impact" and "Elmendorf tear test" were laboratory tests used in the 1950's to measure impact toughness. (Tr. at 89–90.)

31. When asked by Phillips what he needed to establish whether a copolymer with a density within the claims infringed (Tr. at 626), Dr. Beasley testified that:

If we just say the density is [.]935 ... I need to know something about how it was made. For example, if someone said I have made this copolymer that has [.]935 density, is it within the scope of the claims or not, that is not enough information. As I testified earlier, I use all the information available. If on the other hand someone told me that this product has a [.]935 density, contains an alpha-olefin higher than butene, that it was made by people who were skilled in knowing how to make polymers and obtain optimum properties, that it is a product that they designed for commercial use, commercial sale to get the very best properties they could, I would expect, and I think logically infer that they were making use of the improved properties that can be obtained with higher alpha-olefins. Even if that individual never made a butene copolymer under exactly those same conditions. It has been generally established by many different comparisons that under comparable conditions the higher alpha-olefins give better properties. If the only alpha-olefin product is made and there is no direct comparison under the same conditions, but

whether a higher alpha-olefin copolymer known to have a density within the claims would infringe. Phillips has not established the relevance of the proffered testimony to the issue of whether the Witt and Leatherman products had the Elmendorf tear strength of Claim 1,[32] or to its defense of prior invention under § 102(g).[33]

Next, Phillips relies on certain proofs of infringement adduced by DuPont at trial. (D.I. 306 at 19.) Phillips proffers the facts that eight Phillips commercial resins were found to be within the scope of Claim 1, and that one had a melt index of 0.33 and a density of 0.940 and was measured to have an Elmendorf tear strength of 181 grams per mil. (D.I. 306 at 19.)[34] Phillips also proffers the fact that a Witt and Leatherman ethylene-hexene copolymer had a density of 0.940 and a melt index of 0.27. (Id. citing DX 786E.) Phillips argues that because of the similarity between the melt index and density of the infringing resin and those of the Witt and Leatherman copolymer, the latter "necessarily" met the

Elmendorf tear strength limitation of Claim 1. (D.I. 306 at 19.)

The Court does not find Phillips' argument convincing. Phillips asks the Court to infer that the Witt and Leatherman products met the Elmendorf tear strength of Claim 1 because another copolymer having the same density and melt index did. However, Phillips proffers no persuasive evidence of the likelihood that copolymers having the same density and melt index *will* have the same Elmendorf tear strength. Dr. Beasley testified that while it was important for any comparison to be of copolymers having the same density and melt index (Tr. at 594), this did not mean that two copolymers were the same: "As I said before, in polymers there are many different properties. They are complex materials. You don't have the same polymer just because you have the same density, melt index and so on." (Tr. at 105.)

Furthermore, at least one of the two properties asserted as a basis for the com-

---

people who are doing it know how to do it properly, I would conclude, indeed, they have made a product that comes within the scope of the claims.
(Tr. at 626–27.)

**32.** Phillips has not established that the facts assumed by Dr. Beasley are supported by, or fairly inferable from, the record with respect to the Witt and Leatherman products. The environmental stress crack resistance data contained in the Scott notebook (DX 206) do not establish this. Phillips' position appears to be that the environmental stress crack resistance data contained in the Scott notebook show the Witt and Leatherman products were made according to the assumptions made by Dr. Beasley (D.I. 306 at 18; D.I. 310 at 19–20), because only copolymers made according to Dr. Beasley's assumptions would produce this level of stress crack resistance. (D.I. 306 at 18–19; D.I. 310 at 18.) Phillips provides no support for this "bootstrap" argument. That the stress crack resistances of the higher and lower alpha-olefin copolymers evaluated could not be distinguished from one another (Tr. 188, 2385–86, 2755), does not support the argument, particularly since Phillips concedes that higher alpha-olefin copolymers are in fact "better" than lower alpha-olefin copolymers. (D.I. 306 at 28; *see also* Tr. at 103.) DuPont points out that there is evidence in the record regarding the process used to obtain the Witt and Leatherman products. (D.I. 309 at 6, citing Tr. 2354, 2367–74, 3672–76.)

Phillips has not proffered this evidence, although the Court also finds that if the Witt and Leatherman products were made in this way the properties of the Witt and Leatherman products are even less certain. (*See* Tr. 3672–76; *see also* Tr. at 787–88, 813–15, 843–44.)

**33.** It is not at all clear to the Court that by "within the scope of the claims" (Tr. at 627), Dr. Beasley meant would have, literally, every element of the claims. In fact, from other parts of his testimony the Court finds that it is much more likely that Beasley meant to include copolymers which were, in his opinion, equivalent to those claimed. (*See, e.g.,* Tr. at 543, 549, 628, 634; *see also* Tr. at 616.) Such copolymers may not constitute prior invention under § 102(g), even if prior in time to the '698 patent. *See Lewmar Marine, Inc. v. Barient, Inc.,* 827 F.2d 744, 747–48 (Fed.Cir.1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 702, 98 L.Ed.2d 653 (1988). The Court does not suggest that the claims may be construed differently for determining infringement than for validity. *See Laitram Corp. v. Cambridge Wire Cloth Co.,* 863 F.2d 855, 866 (Fed.Cir.1988). Rather the Court questions whether Dr. Beasley was applying the standard used by the Court to determine whether claims are satisfied under § 102(g).

**34.** The range of Elmendorf tear strength claimed is 150 to 400 grams per mil.

parison, the melt index, is *not* the same,[35] and no persuasive evidence is proffered that the commercial resin would also satisfy the claim if it had a .27 melt index. As noted above, according to the testimony of Dr. Beasley it is important when comparing copolymers to at least have the same melt index and density. (Tr. at 594.) Moreover, DuPont proffers evidence that the infringing products were made with a different catalyst than the Witt and Leatherman products, and that this would result in the infringing products having different or even better properties than the Witt and Leatherman products. (D.I. 309 at 26 citing Tr. at 2308.) [36]

Therefore, the Court finds that Phillips has failed to carry its burden of proving by clear and convincing evidence that the Witt and Leatherman products satisfied the Elmendorf tear strength limitation of Claim 1.

### b. *Hoop Stress of Claim 12*

Phillips proffers the same evidence in the Scott notebook and testimony (DX 206; Tr. at 2732–33), and Beasley testimony (Tr. at 627) to establish that the Witt and Leatherman products had the hoop stress resistance of Claim 12. (D.I. 306 at 20.) The Court finds, similarly, that the evidence fails to establish anticipation of Claim 12.

As the Court found in Section IV.A.1.a. of this opinion, Phillips has not established the relevance of the proffered Beasley testimony to anticipation of DuPont's invention under § 102(g). As with Elmendorf tear strength, Phillips has failed to establish the relevance of the Beasley testimony to the issue of whether the Witt and Leatherman products had the hoop stress resistance of Claim 12.

Next Phillips proffers the Scott notebook data on the stress crack resistance of the Witt and Leatherman products, certain findings of infringement by this Court, and other stress crack resistance data for one of the infringing products (PX 378). (D.I. 306 at 20–21.) Phillips argues that because the Court found that the infringing product, commercial resin HHM 5502, met the hoop stress resistance limitation of Claim 12, and that this product showed 50% failures in 45 hours in the same test for environmental stress crack resistance in which the Witt and Leatherman products showed no failures after 360, 456 and 504 hours, it follows that the Witt and Leatherman products must have met the hoop stress resistance limitation of Claim 12. (*Id.* at 20–21.)

The Court finds that Phillips has not carried its burden on anticipation of Claim 12 with this evidence either.[37] Phillips' argument depends on the inference that a copolymer having a higher environmental stress crack resistance than another copolymer will also have a higher hoop stress resistance. In support of the inference, Phillips asserts that environmental stress crack resistance and hoop stress resistance are measurements of the same aspect of a

---

**35.** While Phillips asserts in the main of its argument that the commercial resin with the measured Elmendorf tear strength had "a density of 0.940," it discloses by way of a footnote that the resin actually had a range of densities. (D.I. 306 at 19 n. 10.) The Court notes that 0.940 was at the extreme upper end of that range. *See DuPont,* 656 F.Supp. at 1416. Furthermore, density was determined by the "DuPont 1955 method" to be 0.9369. Therefore, actually, it cannot be said with any degree of certainty that *either* property asserted as a basis to infer that the Elmendorf tear strength of the Witt and Leatherman products was within the range of Claim 1 was the same.

**36.** In its post-trial brief Phillips stated that the new catalyst developed in the early 1970's, and that to which DuPont refers, "resulted in polymers with improved physical properties that had not been obtained previously." (D.I. 259 at 25.)

**37.** It is noteworthy that the burdens of proof for infringement and invalidity are quite different. *Compare Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1361 (Fed.Cir.1983) *with American Hoist & Derrick Co.,* 725 F.2d at 1360. *See also B.W.B. Controls, Inc. v. U.S. Indus., Inc.,* 626 F.Supp. 1553, 1567–68 (E.D.La.1985), *aff'd without op.,* 802 F.2d 471 (Fed.Cir.1986). Therefore, it is possible that DuPont could tip the scale in its favor with respect to infringement though Phillips could not prove invalidity given the same quantum of evidence. *Cf. Carman Indus., Inc. v. Wahl,* 724 F.2d 932, 937 n. 5 (Fed.Cir. 1983). It is also noteworthy that while quick with efforts to "whipsaw" DuPont, Phillips also argues that HHM 5502 is not equivalent to the copolymer of Claim 12 and does not infringe. *See* Section IV.B., *infra.*

copolymer. (D.I. 306 at 20 citing *DuPont,* 656 F.Supp. at 1351; Tr. at 90–93.)[38] However, the Court does not find any support in the evidence for Phillips' assertion. While environmental stress crack resistance and hoop stress resistance may both measure the endurance over time of a copolymer under stress, *see DuPont,* 656 F.Supp. at 1351 citing Tr. at 92–92, Phillips offers nothing to convince the Court that environmental stress crack resistance and hoop stress resistance are covariant.

Furthermore, the Court seriously questions whether, without more, a valid comparison can be made of the Witt and Leatherman products and the infringing resin, or of their environmental stress crack resistance data. Phillips concedes that new catalysts developed in the early 1970's, well after the work of Witt and Leatherman, "resulted in polymers with improved physical properties that had not been obtained previously," and which allowed Phillips "to produce pipe having better properties than had been previously achieved." (D.I. 259 at 25.) With regard to the stress data, while Phillips cites evidence supporting failures of the infringing resin after 45 hours (PX 378), DuPont cites other evidence that the same resin would withstand 1000 hours (PX 640), well in excess of the time reported for the Witt and Leatherman products.[39]

Therefore, the Court finds that Phillips has not proved anticipation of Claim 12 by clear and convincing evidence.

### 2. Nonobviousness Of Claims 1 And 12

■ The Court must now reassess the nonobviousness of Claims 1 and 12 without the "stress crack resistance" and "impact strength" limitations. *DuPont,* 849 F.2d at 1436. More particularly, the Court must determine whether Phillips has shown, by clear and convincing evidence,[40] that the differences between the subject matter of Claims 1 and 12 and the prior art are such that the claimed subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the pertinent art.[41] *See* 35 U.S.C. § 103. This requires consideration of (1) the scope and content of the prior art, (2) the differences between the prior art and Claims 1 and 12, (3) the level of ordinary skill in the pertinent art, and (4) objective evidence of secondary considerations. *Graham v. John Deere Co.,* 383 U.S. 1, 17–18, 86 S.Ct. 684, 693–94, 15 L.Ed.2d 545 (1966); *see also DuPont,* 656 F.Supp. at 1363.

#### a. *The Invention of Claims 1 and 12*

Claims 1 and 12 claim interpolymers, or copolymers, of ethylene and higher alpha-

---

**38.** DuPont adamantly attacks Phillips' equation of environmental stress crack resistance with hoop stress resistance. (D.I. 309 at 28, 29.)

**39.** To rebut the evidence cited by DuPont that the infringing resin would withstand 1000 hours, Phillips does not offer evidence to support the conclusion that DuPont's evidence is wrong. Rather Phillips argues only that DuPont has not shown that the pipe for which the stress data cited by DuPont were presented actually incorporated the infringing resin, because Phillips has used five different resins in this pipe over the years. (D.I. 310 at 22.) However, Phillips, not DuPont, has the burden to prove the facts establishing its anticipation defense by clear and convincing evidence. *See Carella v. Starlight Archery and Pro Line Co.,* 804 F.2d 135, 138 (Fed.Cir.1986); *RCA Corp. v. Applied Digital Data Systems, Inc.,* 730 F.2d 1440, 1444 (Fed.Cir. 1984); *Railroad Dynamics, Inc. v. A. Stucki Co.,* 727 F.2d 1506, 1517 (Fed.Cir.), *cert. denied,* 469 U.S. 871, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984). While the Court may not be convinced that the resin would withstand 1000 hours, neither is it convinced of the figures asserted by Phillips.

*Cf. Rolls–Royce Ltd. v. GTE Valeron Corp.,* 625 F.Supp. 343, 353 (E.D.Mich.1985), *aff'd,* 800 F.2d 1101 (Fed.Cir.1986) (clear and convincing burden not carried by infringer where substantial question or ambiguity in evidence exists).

**40.** The facts underlying a determination of obviousness also must be proven by clear and convincing evidence. *Carella v. Starlight Archery and Pro Line Co.,* 804 F.2d 135, 138 (Fed.Cir. 1986); *RCA Corp. v. Applied Digital Data Systems, Inc.,* 730 F.2d 1440, 1444 (Fed.Cir.1984); *Railroad Dynamics, Inc. v. A. Stucki Co.,* 727 F.2d 1506, 1517 (Fed.Cir.), *cert. denied,* 469 U.S. 871, 105 S.Ct. 220, 83 L.Ed.2d 150 (1984).

**41.** In its earlier opinion the Court found that a person of ordinary skill in the art would be someone with (1) a Bachelor's degree in chemistry or chemical engineering plus about 3 years of experience in the field of making and testing polymers, preferably polyethylene, or (2) a Master's degree and two years of such experience, or (3) a Ph.D. degree and one year of such experience. *DuPont,* 656 F.Supp. at 1366.

olefins having a melt index in the ranges of 0.3 to 20, a density within a specified range, and an Elmendorf tear strength (Claim 1) or a hoop stress resistance (Claim 12).[42] Construed in light of the specification, *see United States v. Adams*, 383 U.S. 39, 49, 86 S.Ct. 708, 713, 15 L.Ed.2d 572 (1966), the Court concludes that the invention claimed is branched copolymers having an advantageous combination of properties obtained by copolymerizing higher alpha-olefins with ethylene. (PX 1, col. 3, *11*, 15–18.) More particularly, the invention is a copolymer of ethylene and higher alpha-olefins having an improved property (viz: Elmendorf tear strength or hoop stress resistance) desirable in the ultimate service or performance of an article fabricated from it,[43] and at the same time retaining other properties (*e.g.* melt index) which are amenable to conventional fabricating techniques. (*See, e.g.*, PX 1, col. 3–4.)

To carry its burden of proof, Phillips must prove by clear and convincing evidence that it was obvious to the artisan at the time of DuPont's invention in view of the prior art to obtain copolymers of ethylene and higher alpha-olefins having the combination of properties claimed.

b. *Scope and Content of the Prior Art*

The Court will readdress the scope and content of the prior art relied on by Phillips at trial, focusing now on the invention of Claims 1 and 12 as defined by the Federal Circuit.[44] The following findings of fact

supplement rather than supplant the findings contained in the Court's earlier opinion. *See DuPont*, 656 F.Supp. at 1364–72.

i. The Witt and Leatherman Products

DuPont admitted that the Witt and Leatherman products included an ethylene/1–pentene and ethylene/1–hexene copolymer with a comonomer-type, density, melt index, percent crystallinity and weight percent comonomer content falling within the ranges of the claims of the '698 patent. (Tr. at 1279; *see also DuPont*, 849 F.2d at 1434 & n. 3.) However, Phillips has not proved that the Witt and Leatherman products had these properties in combination with the improved Elmendorf tear strength or hoop stress resistance set forth in Claims 1 and 12. *See* Section IV.A., *supra*.[45] Thus, in considering the Witt and Leatherman products as § 103 prior art, the Court will not assume the products had these properties.

Nor has Phillips shown by clear and convincing evidence that the combination of properties obtained with higher alpha-olefins in accordance with DuPont's invention would have been obvious to the artisan at the time of the invention, in view of the Witt and Leatherman products. The Court found that in the mid 1950's, one would have been taught to decrease branch points to improve properties such as stress crack resistance and impact strength, and that the artisan would have been taught that

42. Claim 1 has a further limitation with respect to comonomer content, and Claim 12 is further limited with respect to its X-ray crystallinity.

43. While the focus of the Court's earlier finding was "environmental stress crack resistance" and "impact strength," it is apparent that this was not the exclusive list of improved properties intended by DuPont. (*See, e.g.*, PX 1, col. 3, *11*. 15–18). For example, the Elmendorf tear test is disclosed in the '698 patent as a measurement of impact toughness. (PX 1, col. 4, *11*. 35–36.)

44. The scope and content of the prior art relied on by Phillips for obviousness included the Witt and Leatherman products, the seven anticipation references, and seven additional patents and publications, viz: the Buckley and Ray article (DX 121), Hagemeyer et al. U.S. Patent 2,899,413 (DX 41), Belgian Patent 538,782 (DX 106A), Anderson et al. U.S. Patent 2,905,645 (DX 6), the Roedel article (DX 152), the Richards article (DX 151), and the Franta U.S. patent

2,586,322 (DX 38). *See DuPont*, 656 F.Supp. at 1364; *see also* D.I. 259 at 62–63.

45. Phillips argues that "[i]t is of no consequence that the particular strength values specified in the claims may not have been precisely known where the obvious products would in fact have possessed the claimed characteristics." (D.I. 306 citing *In re Wilder*, 563 F.2d 457, 460–61 (C.C.P.A.1977); and *In re Wiseman*, 596 F.2d 1019, 1023 (C.C.P.A.1979).) Even if this argument accurately reflected principles of law which could be distilled from the authorities it cites, Phillips has *not* shown that the Witt and Leatherman products *would* have possessed the characteristics of Claims 1 and 12. Phillips' problem here is one of proof, it has failed to establish that the Witt and Leatherman products did *or* would have the Elmendorf tear strength or hoop stress resistance properties claimed.

lower alpha-olefins were preferred for this. *DuPont,* 656 F.Supp. 1351. In fact, the Court found that the environmental stress crack resistance data for the Witt and Leatherman products showed no difference between higher and lower alpha-olefin copolymers, *see* Section IV.A.1, *supra; see also DuPont,* 656 F.Supp. at 1354–56, and that the "Izod impact strength" data supports a preference for lower alpha-olefins. *Id.* at 1354 (citing PX 88, Table VI; Tr. 168–73; Tr. at 2059; Tr. at 1472.) Therefore, if the Witt and Leatherman products taught anything with regard to the combination of properties of Claims 1 and 12 it was that the combination was less likely with copolymers of ethylene and higher alpha-olefins.

### ii. Richards, Roedel, Franta, and Buckley and Ray

Richards (DX 151) taught that flexibility and toughness could be improved by lowering the crystallinity (or density). (*Id.* at 372). The Court found that Richards taught nothing about the effect of the length of the branches or side chains, or improved impact strength or stress crack resistance. *DuPont,* 656 F.Supp. at 1364. The Court finds further that Richards taught nothing about improved Elmendorf tear strength or hoop stress resistance. Furthermore, it would not have been obvious to the artisan in view of Richards that longer branches would be better than shorter branches in producing an ethylene copolymer with superior Elmendorf tear strength or hoop stress resistance. Therefore, nothing in Richards suggested that higher alpha-olefins could be polymerized with ethylene to effect this end.

The Roedel article (DX 152) proposed mechanisms to account for the occurrence of long and short chain branching in free-radical polyethylene. *DuPont,* 656 F.Supp. at 1364. Roedel suggested that by controlling the average molecular weight and degree of long and short chain branching,

properties of polyethylene polymers could be varied. (Tr. at 6112.) However, there was no suggestion that Elmendorf tear strength or hoop stress resistance could be improved by addition of higher alpha-olefins to ethylene polymers. In fact, Roedel taught that long chain branching would not effect *solid state* properties such as Elmendorf tear strength or hoop stress resistance. (Tr. at 1717–18).

The Franta patent (DX 38) disclosed free radical ethylene homopolymers having a high density and stiffness, but having a melt viscosity suitable for molding operations. (*Id.* at col. 3.) Franta taught that this "anomalistic result" was obtained by carrying out the polymerization of ethylene at a known pressure and temperature with an accepted catalyst and in the presence of a prescribed quantitative amount of cyclohexane. (*Id.* at col. 2–3.) Franta taught that the cyclohexane controlled chain growth during polymerization and the amount present was crucial to obtaining a polymer with the desired combination of properties. (*Id.* at col. 3.) Franta did not, however, suggest that these polymers had superior properties such as Elmendorf tear strength or hoop stress resistance,[46] nor that the combination of properties which was claimed by it could be obtained with higher alpha-olefin copolymers. The focus of the Franta reference was the addition, and thus the presence, of cyclohexane to effect the properties.

The Buckley and Ray article (DX 121) disclosed materials made from the decomposition mixtures of diazomethane and 1–diazohexane.[47] While the article suggested that the crystallinity of a copolymer made by decomposition of diazo compounds could be decreased by either increasing the number of branches or using longer branches (*id.* at 3702); *see also DuPont,* 656 F.Supp. at 1366, it did not suggest a scheme to obtain the combination of properties in Claims 1 and 12. The bare suggestion that the physical properties of the materials de-

---

46. As found in the Court's prior opinion the evidence that is available suggests the Franta polymers did not have properties characteristic of the '698 patent. *See DuPont,* 656 F.Supp. at 1365.

47. According to Phillips, and Dr. Price (Tr. at 1350), the mixture of diazomethane and diazohexane yields a material structurally equivalent to copolymerized ethylene and 1–heptane.

pended on both the number and length of branches provided no guidance toward the invention of Claim 1 or 12, where particular properties are achieved in a particular way, viz: the addition of higher alpha-olefins to ethylene polymers.

### iii. Anderson '645, Hagemeyer '413, and Belgian '782

The Court's prior findings with respect to the remaining prior art references relied on by Phillips—the Anderson '645 patent (DX 6), the Hagemeyer '413 patent (DX 41), and the Belgian '782 patent (DX 106A)—are unchanged with respect to Claims 1 and 12 as defined by the Federal Circuit. Furthermore, nothing in those references taught or suggested that the claimed combinations of properties could be obtained with copolymers of ethylene and higher alpha-olefins.

### iv. DuPont Ethylene–Butene Copolymers

Phillips now relies on certain DuPont ethylene-butene copolymers (D.I. 306 at 25), although it did not rely on these in its post-trial argument with respect to the scope and content of § 103 prior art.[48] However, assuming that the DuPont ethylene-butene copolymers are available as § 103 prior art against Claims 1 and 12,[49] they did not render the claims obvious to the artisan. Ethylene-butene copolymers are lower alpha-olefin copolymers. (Tr. at

87–88, 108.) Phillips argues that because they had Elmendorf tear strengths or hoop stress resistances within the claims, they rendered the higher alpha-olefin copolymers of the invention obvious. (D.I. 306 at 25.) However, the DuPont lower alpha-olefin copolymers did not suggest anything to the artisan with respect to higher alpha-olefin copolymers; and as found above, the art, including work by Phillips, suggested that higher alpha-olefin copolymers would not perform as well as lower alpha-olefin copolymers such as ethylene-butene. DuPont found that the opposite was true. Therefore, the Court is not convinced by this "eleventh hour" argument made by Phillips.

### c. Differences Between Claims 1 and 12 and the Prior Art

The crucial difference between the prior art and Claims 1 and 12 is that there was nothing in the prior art that disclosed or suggested to the contemporary artisan that a material having the claimed combination of properties could be obtained by a copolymer of ethylene and higher alpha-olefins. In fact, rather than clearly and convincingly establishing that the copolymers of Claims 1 and 12 were obvious to the artisan, the evidence tends to support the nonobviousness of them.

**48.** The Court is tempted to not consider Phillips' arguments with respect to the DuPont ethylene-butene copolymers. Phillips did not include these copolymers as § 103 prior art in its post-trial arguments. The Federal Circuit did not instruct this Court to address new arguments respecting the nonobviousness of the claims, save arguments related to the Witt and Leatherman products.

**49.** Pursuant to the 1984 amendment of § 103, after November 8, 1984, prior work of another directed to subject matter which was subject to common ownership with an invention at the time the invention was made is not available as § 103 prior art against the invention. See 35 U.S.C. § 103 (as amended Nov. 8, 1984, Pub.L. 98–622, Title I § 103, 98 Stat. 3384); see also note 5 supra. But the amendment did not "affect the right of any party in any case pending in a court on the date of enactment to have their rights determined on the basis of the substantive law in effect prior to the date of enactment." Pub.L. 98–622 § 106(e), 98 Stat. 3383, 3386. The legislative history of the amendment provides that "[t]he Committee intends that

such cases should be determined on the basis of the substantive law existing prior to the date of enactment." Section–by–Section Analysis: Patent Law Amendments of 1984, 98th Cong., reprinted in 1984 U.S.Code Cong. & Admin.News 5827, 5833–34. The date of enactment was November 8, 1984, and this case was filed in November, 1981. (D.I. 1.) Clearly, this case was filed before the date of enactment. However, the Court's findings and conclusion with respect to the nonobviousness of Claims 1 and 12 in view of the DuPont ethylene-butene copolymers make it unnecessary for the Court to reach the questions of whether the ethylene-butene copolymers would be § 103 prior art under the substantive law existing prior to the date of enactment, or whether the exception in Pub.L. 98–622 § 106(e) applies where, as here, a case has been remanded for reconsideration of nonobviousness but the references in question were not originally relied on as § 103 prior art to attack the validity of the patent. See 1984 U.S.Code Cong. & Admin.News at 5836.

The evidence shows that at the time of DuPont's invention the teachings with regard to free radical ethylene polymers were that the physical properties such as impact resistance, stress crack resistances, Elmendorf tear strength and hoop stress resistance varied inversely with respect to other properties such as melt index and density. That is, in order to obtain a polymer with an advantageous Elmendorf tear strength or hoop stress resistance, an advantageous melt index had to be sacrificed. (Tr. at 101–109; DX 38 col. 1–3.) Moreover, according to these teachings the introduction of higher alpha-olefins into ethylene polymers would have been disadvantageous with respect to properties such as Elmendorf tear strength and hoop stress resistance. (Tr. at 101–103, 109.)

Phillips argues that Claims 1 and 12 were obvious because the prior art taught that in order to improve the claimed strength properties, such as Elmendorf tear strength and hoop stress resistance, the artisan would have lowered the density and melt index rather than have employed higher alpha-olefins; and that the Witt and Leatherman products could have been modified in this way. (D.I. 306 at 24–25, 27–28.) This argument is fundamentally flawed for several reasons. First, copolymers of ethylene and higher alpha-olefins, i.e., 5–10 carbon chains, are what is claimed, in addition to the density, melt index and Elmendorf tear strength or hoop stress resistance. The coincidence of the claimed elements is the invention.[50] The Court has found that Phillips has not shown that it would have been obvious that the invention "as a whole" could be obtained by copolymers of ethylene and higher alpha-olefins.

Second, Phillips has not shown that varying the properties of the Witt and Leatherman products in the way it now suggests would have resulted in a copolymer within the claims at issue here. In fact, as DuPont argues, based on the available data, the properties of the Witt and Leatherman products would not have been within the claims if varied in the way suggested by Phillips. (D.I. 309 at 39.)

Accordingly, Phillips has not established a prima facie case of the obviousness of Claim 1 or 12.[51] Therefore, in view of the Court's finding in Section IV.A.1. of this opinion, supra, Phillips has not carried its burden of showing that Claim 1 or 12 are invalid. Thus, the claims are presumed valid. 35 U.S.C. § 282.

## B. *Infringement of Claims 1 and 12*

■ Having concluded in Section IV.A., supra, that Phillips has not proved that Claim 1 or 12 are invalid, the Court turns to the Federal Circuit's remand instructions regarding infringement.

The Federal Circuit vacated this Court's judgment of infringement for Claims 1 and 12, and instructed this Court to reconsider the "0.95" density and "70%" crystallinity parameters "appearing in claims 1 and 12." DuPont, 849 F.2d at 1437–38. However, Claim 1 does not contain the parameters referred to by the Federal Circuit.[52] Therefore, the Court reiterates here its prior findings of infringement with respect to Claim 1, see DuPont, 656 F.Supp. at 1390–91, and finds that eight copolymers infringe Claim 1: HHM TR–130, HHM TR–230, HHM TR–232 Black, HHM TR–232 Yellow, HHM TR–418 Black, HHM TR–418 Orange, 728 Fluff, and 728–01.

---

**50.** It is improper to analyze the nonobviousness of an invention by the parts rather than the whole. *See Custom Accessories, Inc. v. Jeffery-Allan Indus., Inc.,* 807 F.2d 955, 959 (Fed.Cir. 1986); *see also* 35 U.S.C. § 103.

**51.** Because Phillips has not established a prima facie case of obviousness, the Court need not consider, further, the secondary considerations, although the Court's prior findings apply with equal force to Claims 1 and 12 as defined by the Federal Circuit. *See DuPont,* 656 F.Supp. at 1369–72.

**52.** It appears that the Federal Circuit was working under the misapprehension that the "0.95" density and "70%" crystallinity parameters appeared in both Claims 1 and 12. *See DuPont,* 849 F.2d at 1437–38 ("Phillips urges that the '0.95' limitation appearing in the *claims* . . . ." *Id.* at 1438 (emphasis added).). Although Claim 1 does contain a density limitation, the upper limit of the claimed range is "0.94," below "0.95."

Claim 12 does, however, contain the "0.95" density and "70%" crystallinity limitations. This Court's prior findings of infringement of Claim 12 were that Phillips directly infringed by making and selling nine pipe products,[53] and actively induced infringement by making and selling four resins for use in pipe products.[54] *See DuPont*, 656 F.Supp. at 1391–92. Eight resins were in one or both categories of infringement: HHM TR–401, HHM TR–418 Black, HHM TR–418 Orange, HHM TR–480

Black, HHM TR–130, HHM TR–140, HHM 5202, and HHM 5502.

The only resins at issue on remand are those having a density above 0.950 or a crystallinity above 70%. *See DuPont*, 849 F.2d at 1439. Therefore, of the eight resins found to have infringed claim 12, five are at issue here: HHM 5202, HHM 5502, HHM TR–401, HHM TR–480 Black, and HHM TR–140.[55] Their densities and crystallinities are tabulated below.

| RESIN | DENSITY | % CRYSTALLINITY |
| --- | --- | --- |
| HHM 5502 | *0.9516 or 0.956 | 79.2 |
| HHM 5202 | *0.9504 or 0.952 | 74.3 |
| HHM TR–140 | 0.9444 | 72.5 |
| HHM TR–401 | 0.9428 | 71.4 |
| HHM TR–480 Black | 0.9555 | 67 |

*Density is disputed between Phillips and DuPont.

The data reflected in this table were taken from Appendix A of this Court's earlier opinion. *See DuPont*, 656 F.Supp. at 1396 *et seq.*

In accordance with the Federal Circuit's instructions the Court must readdress its interpretation of the "0.95" density and "70%" crystallinity limitations in Claim 12, and then, readdress infringement by the five resins at issue with respect to these limitations.

### 1. The Meaning Of The "0.95" and "70%" Limitations

The Federal Circuit ruled that the prosecution history of the '698 patent is relevant to the meaning of the "0.95" density and "70%" crystallinity limitations, and specifically noted instances in the prosecution history where DuPont stated that certain densities and crystallinities were not within the claims. *DuPont*, 849 F.2d at 1438–39.

Thus, the Court must "ascertain the meaning" of these limitations by resort to the specification and claims as well as the prosecution history. *Id.* at 1439.

### a. The "0.95" Density Limitation

The Federal Circuit has pointed to several statements made by DuPont to the Patent Office during the prosecution of the '698 patent with regard to the "0.95" density limitation. The statements were that 0.954 and 0.9547 fell outside the scope of the claims, that 0.9557 was "far above" the invention, and that 0.9585 was "a quite high density." *See id.* at 1438.

DuPont argues that density can be accurately reported to four significant figures, that "0.95" is set forth to only two, and therefore it includes "the values between 0.9451 and 0.9550." (D.I. 304 at 12.) Phillips argues, of course, that "0.95" means "0.950." (D.I. 307 at 4, 7.)

---

**53.** The nine pipe products were: Driscopipe 1000; Driscopipe 6300; Driscopipe 6400; Driscopipe 6500; Driscopipe 3300; Driscopipe 3400; Driscopipe 3700; Driscopipe 3800; and, Driscopipe 3900. *See DuPont*, 656 F.Supp. at 1391–92. The resins which were used at one time or another to make those products were: HHM TR–401; HHM TR–418 Black; HHM TR–418 Orange; and, HHM TR–480 Black. (PX 1236.)

**54.** The four resins made and sold by Phillips were: HHM TR–401; HHM TR–418 Black;

HHM TR–418 Orange; and, HHM TR–480 Black. *See DuPont*, 656 F.Supp. at 1392.

**55.** While the parties apparently agree that HHM 5202, HHM 5502, and HHM TR–401 and HHM TR–140 are at issue (*see* D.I. 304 at 9–10; D.I. 307 at 2–3), the Court finds that HHM TR–480 Black is also at issue, since it has a density of 0.9555 as determined by the "DuPont 1955 method." *See DuPont*, 656 F.Supp. at 1419; PX 1235.

DuPont's argument apparently is that if it had meant to be more precise in specifying the upper density limit it would have done so by tacking one or more zero's onto 0.95, i.e. 0.950 or 0.9500; and that since it did not, it intended 0.95 to be read to two significant figures. This argument finds some support in the claims and specification. DuPont reported density data to 3 and 4 figures, and in several instances employed a zero as the last figure (*see, e.g.,* PX 1, Tables II, V). DuPont also set forth densities and ranges of densities throughout the specification to 1, 2 and 3 figures, and in several instances used a zero as the last figure (*see, e.g.,* PX 1, col. 8, *11.* 33–51; col. 13, *11.* 9–12). In the claims, densities were set forth to 1, 2 and 3 figures and again in several instances a zero was used as a last figure (*see, e.g.,* PX 1, col. 13, *1.* 4, col. 14, *11.* 10, 27). Thus, since DuPont used 1, 2, 3 and 4 figures to refer to densities and a zero as the last figure in several instances, the Court could infer that DuPont deliberately claimed the upper density limit to two figures, i.e., "0.95," rather than to more. As found in this Court's earlier opinion, scientifically, "0.95" is less precise than 0.950 or 0.9500. *See DuPont,* 656 F.Supp. at 1385 (*see also* PX 3 at 000419).[56]

However, in view of the statements made by DuPont during the prosecution of the '698 patent, the Court is unable to accept DuPont's position now that "0.95" includes all densities above 0.9500 but below 0.9550. In response to a reference cited by the examiner, DuPont stated:

[W]herever given in Field and Feller, the densities of the "normally solid hydrocarbon material" polymerization product, where some olefinic material, other than propylene, was included in the reaction mixture with ethylene, were in the range of linear polyethylene homopolymers (0.954–0.97) rather than in the range (0.9 to 0.95) of the novel branched polyethylenes (ethylene 1–olefin copolymers) claimed by applicants. While density alone is not enough to define precisely the structures of an olefin polymer, such differences are sufficient to show that the polymers are quite different and distinct, both in structure and in physical properties dependent on density and crystallinity.

(PX 3 at 000404.) DuPont also stated that 0.9547, the density of a certain solid hydrocarbon resin product, was "well above densities of applicants' branched polyethylenes." (*Id.* at 000405.)

These statements simply do not square with the interpretation DuPont advances now. If the Court interpreted 0.95 the way DuPont urges, both 0.954 and 0.9547 would be included within the range. Furthermore, no non-arbitrary limit between 0.950 and 0.954 is advanced by DuPont, and the Court can find support for none. Therefore, the Court concludes that the "0.95" density upper limit means 0.950.[57]

However, the Court finds that 0.95 does not mean 0.9500 or anything more precise. While density may be accurately ascertained to four significant figures, (Tr. at 359), and, in fact, DuPont reported density data to four significant figures in the specification, no density limitation in any claim of the '698 patent is so precise. Nor is any range of densities for the invention described in the specification with such precise limits.[58] DuPont's statements that

---

56. The meaning of the "0.95" limit should be ascertained by resort to the specification, claims and prosecution history of the '698 patent, and construed as it would be by those skilled in the art. *Loctite Corp. v. Ultraseal Ltd.,* 781 F.2d 861, 867 (Fed.Cir.1985).

57. It is noteworthy that there is further support in the specification for the Court's conclusion that, in effect, DuPont was not always deliberately precise in its use (or omission) of zeros as a last figure to communicate significant figures. In discussing the relationship between density and crystallinity DuPont appears to have used "0.9" and "0.90" interchangeably. (*See* PX 1, col. 8, *11.* 33–62.)

58. The Court will not ascribe a more precise meaning to the "0.95" density limitation than it can find support for. *See Constant v. Advanced Micro-Devices, Inc.,* 848 F.2d 1560, 1571 (Fed. Cir.), *cert. denied,* — U.S. —, 109 S.Ct. 228, 102 L.Ed.2d 218 (1988); *see also Fonar Corp. v. Johnson & Johnson,* 821 F.2d 627, 632 (Fed.Cir. 1987), *cert. denied,* — U.S. —, 108 S.Ct. 751, 98 L.Ed.2d 764 (1988).

0.9547, 0.9557, and 0.9585 were not within the claims do not persuade the Court to interpret the 0.95 density limit to mean 0.9500.

b. *The "70%" Crystallinity Limitation*

In its prior opinion this Court found that the "70%" upper crystallinity limit of Claim 12 meant 70%. *See DuPont*, 656 F.Supp. at 1387. To the extent that this Court's earlier opinion can be construed as interpreting the 70% limit to mean something higher (or lower), the Court now makes clear that the 70% upper limit means 70%.[59]

### 2. Literal Infringement

The Court's inquiry with respect to literal infringement is whether the density and crystallinity limitations of Claim 12, as interpreted above, read on those of the five resins at issue. *See Loctite Corp. v. Ultraseal Ltd.*, 781 F.2d 861, 866 (Fed.Cir. 1985).[60]

a. *Literal Infringement of the 0.95" Density Limitation*

The densities of HHM TR–140 and HHM TR–401 are below 0.950 and thus are not at issue here. *See DuPont*, 849 F.2d at 1429.

0.950 does not read on 0.9516, the density of HHM 5502 posited by DuPont, or on 0.9550 the density of HHM TR–480 Black. Therefore, neither HHM 5502 nor HHM TR–480 Black literally infringes Claim 12.

0.950 reads on 0.9504, the density of HHM 5202 posited by DuPont, although not on 0.952, the density posited by Phillips. The different densities result from different methods of determination, the "DuPont 1955 method," and the "ASTM D 1928 method." The density posited by DuPont was determined by the "DuPont 1955 method." As the Court found in its prior

opinion, the evidence at trial established the competence of the density values determined by the "DuPont 1955 method." *See DuPont*, 656 F.Supp. at 1386–87. Therefore, the Court finds that DuPont has shown by a preponderance of the evidence that HHM 5202 had a density of .9504 and thus literally infringes "0.95" as interpreted above.

b. *Literal Infringement Of The 70% Crystallinity Limitation*

The crystallinity of HHM TR–480 Black, 67%, is literally within the 40–70% range claimed. Therefore, DuPont has proved by a preponderance of the evidence that HHM TR–480 Black literally infringes the claimed crystallinity of Claim 12.

In its prior opinion the Court found that the other four resins at issue here, which have measured crystallinities above 70.0%, infringed the 40–70% range claimed. The Court found that the evidence at trial established that measurements of the crystallinity of a given resin could vary from 10–20%. *See DuPont*, 656 F.Supp. at 1387. Therefore, although a resin actually had a crystallinity within the claimed range its crystallinity could be measured to be up to 20% outside of the range. (Tr. at 620.)[61]

The Court did not specifically address whether DuPont had proved literal infringement by these resins, since the Court found that the resins infringed under the doctrine of equivalents. *See id.* at 1387–88. After considering the evidence, the Court finds that DuPont has not proved by a preponderance of the evidence that resins HHM 5202, HHM 5502, HHM TR–140 and HHM TR–401 having crystallinities of 79.2%, 74.3%, 72.5%, and 71.4%, respectively, literally infringe Claim 12.

---

**59.** The Federal Circuit apparently construed this Court's opinion to have interpreted "70%" to literally mean 70% ± 10 to 20%. *See DuPont*, 849 F.2d at 1439. However, the Court's reference to plus or minus 10 to 20% was with respect to the measurement of crystallinities of the infringing products, and not the claimed range. *See DuPont*, 656 F.Supp. 1387–88; *see also* note 61, *infra*. Therefore, the statements made by DuPont during prosecution of the patent, viz: that crystallinities of 38% and 32% were not within the claims, do not change the Court's interpretation of the 70% limit.

**60.** The Court's determinations of infringement with respect to the other limitations of Claim 12, e.g. hoop stress resistance, were undisturbed on appeal.

**61.** This is not the same as concluding that the claimed range is 70.0% ± 10 to 20%, because in order to show literal infringement the patentee still has the burden to prove that although measured to be greater than 70.0% the crystallinity is actually within the claimed range.

### 3. Infringement Under Doctrine Of Equivalents

DuPont has not proved that any of the five resins at issue literally infringed Claim 12, because their density or crystallinity is outside of the literal range. However, infringement may nonetheless be found under the doctrine of equivalents if the accused resins and the claimed interpolymer perform substantially the same function in substantially the same way to yield substantially the same result. *Atlas Powder Co. v. E.I. DuPont de Nemours & Co.*, 750 F.2d 1569, 1579 (Fed.Cir.1984) *citing Graver Tank & Mfg. Co. v. Linde Air Products Co.*, 339 U.S. 605, 608–09, 70 S.Ct. 854, 856–57, 94 L.Ed. 1097 (1950); *see also ZMI Corp. v. Cardiac Resuscitator Corp.*, 844 F.2d 1576, 1581 (Fed.Cir.1988). The doctrine exists for "the equitable purpose of 'prevent[ing] an infringer from stealing the benefit of an invention.'" *Texas Instruments, Inc. v. ITC*, 805 F.2d 1558, 1572 (Fed.Cir.1986) *citing Graver Tank*, 339 U.S. at 608, 70 S.Ct. at 856.

To find infringement under the doctrine the Court must find that the five resins at issue possessed, equivalently, the limitations of Claim 12 not possessed literally. *See ZMI Corp.*, 844 F.2d at 1582.[62] The Court will, therefore, determine whether the densities and crystallinities of the resins at issue which are outside the literal ranges claimed are substantially equivalent to those literally claimed.[63] To be a substantial equivalent the difference between

the claimed density or crystallinity and that of the resin at issue must not be such that would substantially change the way in which the claimed interpolymer performs. *see Perkin–Elmer Corp. v. Westinghouse Electric Corp.*, 822 F.2d 1528, 1533 (Fed. Cir.1987).

### a. *Equivalents of the Claimed Density*

The Court must determine whether the densities of HHM TR–480 Black, 0.9555, and HHM 5502, 0.9516, are the substantial equivalents of that claimed, i.e. "0.9 to 0.95."[64]

The purpose of the density limitation is to distinguish the interpolymers of the invention from homopolymers. (Tr. at 888–89.) During the prosecution of the patent DuPont stated that the range of densities for linear polyethylene homopolymers was "0.954–0.97." (PX 3 at 000403.) The density of HHM TR–480 Black, 0.9555, is within this range. Therefore, the Court finds that it is not the substantial equivalent of the range of densities claimed.[65]

The density of HHM 5502, 0.9516, is not within the range posited by DuPont for linear homopolymers. Dr. Beasley testified that with respect to DuPont's invention a density of .9525 was equivalent to 0.95 (Tr. at 538–39), and that the density ranges of .954 to .957 and .953 to .956 were "[e]ssentially equivalent" (Tr. 523). Phillips' own expert, Dr. Levett, testified that Phillips "traditionally" allowed the density

---

**62.** As noted, *see* note 60 *supra*, the Court's prior infringement determinations with respect to the limitations of Claim 12 other than density and crystallinity were undisturbed on appeal.

**63.** This Court found in its earlier opinion that certain of the products at issue infringed under the doctrine of equivalents, because Phillips had appropriated the essence or heart of DuPont's invention. *See DuPont*, 656 F.Supp. at 1389. That is, that the products achieved the same melt processable copolymers with the same superior impact strength and stress crack resistance in the same way. *Id.* The Court makes a similar finding with regard to the hoop stress resistance of Claim 12. However, several decisions of the Federal Circuit issued since this Court's prior opinion counsel this Court to address infringement under the doctrine of equivalents more specifically with respect to the particular limitations in Claim 12 at issue. *See*

*Perkin–Elmer Corp. v. Westinghouse Electric Corp.*, 822 F.2d 1528, 1533 & n. 8 (Fed.Cir.1987); *see also Laitram Corp. v. Cambridge Wire Cloth Co.*, 863 F.2d 855, 856–57 (Fed.Cir.1988); *ZMI Corp.*, 844 F.2d at 1582; *Pennwalt Corp. v. Durand–Wayland, Inc.*, 833 F.2d 931, 934–35 (Fed. Cir.1987), *cert. denied*, —— U.S. ——, 108 S.Ct. 1226, 99 L.Ed.2d 426 (1988).

**64.** HHM 5202 literally infringes the claimed density and HHM TR–140 and HHM TR–401 have densities which are below 0.950, and thus not at issue.

**65.** The Court reiterates its finding contained in its earlier opinion that the statements DuPont made to the Patent Office, including that range of densities for linear homopolymers was "0.954–0.97," did not create an estoppel. *See DuPont*, 656 F.Supp. at 1388.

in most of its products to cover four in the third decimal place spread ... [i.e.] .953, .954, .955, .956" (Tr. at 3157), and that the range of densities sold as HHM 5502 was .953 to .956 (Tr. at 3197–99). Dr. Levett also testified that purchasers of Phillips products could expect "a tolerance of plus or minus .002." (Tr. at 3158.) [66] Therefore, the Court finds that the density of HHM 5502, .9516, is substantially equivalent to the 0.9–0.95 range of densities claimed.

### b. *Equivalents of the Claimed Crystallinity*

The crystallinities of HHM 5502, HHM 5202, HHM TR–140, and HHM TR–401 are literally above the 40–70% range of crystallinities claimed.[67] The Court must determine whether each is substantially equivalent to those claimed.

Dr. Beasley testified that crystallinity values reported above 90% would be outside the range of the invention (Tr. at 619–20), but that values up to 90% would be "close enough." (Tr. at 621.) The Court finds that Dr. Beasley's testimony was that the higher alpha-olefin copolymers of the invention, including Claim 12, could have crystallinity values of up to 90% and still be equivalent to those literally claimed, that is they could still capture the advantages of the invention, viz: melt processability and

improved hoop stress resistance. Each of the crystallinity values at issue here is well below the 90% limit, and their hoop stress resistances and melt indices are within the claims.[68] Furthermore, Dr. Beasley testified specifically that the crystallinity values for each of the resins at issue was equivalent to that claimed. (Tr. at 407 [HHM 5502, 79.2%]; Tr. at 402, 491 [HHM 5202, 74.3%]; Tr. at 429 [HHM TR–140, 72.5%]; Tr. at 469 [HHM TR–401, 71.4%].)

Additionally, the patent teaches a relationship between the density and crystallinity of the claimed copolymers. (PX 1, col. 8, *11.* 33–62.)[69] Dr. Price also testified to such a relationship (Tr. at 1318, 1334, 1357; *see also* Tr. at 1334–34a), and that "density is a very accurate measurement." (Tr. at 1352.) Dr. Beasley testified that crystallinity measurements, on the other hand, should not, by themselves, be relied on to any great extent in characterizing copolymers. (Tr. at 619.)[70] Dr. Wilson, an expert with nearly 30 years' experience with X-ray diffraction which is used to measure crystallinity, testified that because of the subjective judgment involved in crystallinity measurements they can vary 10–20% from one lab to the next, and that there was no "standard correction formula" to account for this variance. (Tr. at 1041.)[71] There-

---

**66.** Dr. Levett's testimony that higher densities could make a copolymer resin "unsuitable for a certain application" does not persuade the Court that the products are not substantially equivalent to those claimed. (Tr. at 3158.) Exact identity of properties is not required to establish equivalency. *See Perkin–Elmer Corp.,* 732 F.2d at 901; *see also Laitram Corp.,* 863 F.2d at 859. "[I]nefficient infringement is still infringement." *Id.* & n. 11 (footnote omitted). Dr. Levitt would not testify that the difference between ranges of .949 to .952 and .953 to .956 would significantly change the product. (Tr. at 3158–59.)

**67.** The crystallinity of HHM TR–480 Black, 67%, is literally within the claimed range, although its density, 0.9555, is neither literally within the claimed range nor the substantial equivalent thereof.

**68.** As noted above, note 60 *supra,* the Court's earlier finding that each of the products at issue here met the hoop stress resistance and melt index limitations of Claim 12 was undisturbed on appeal. *See DuPont,* 656 F.Supp. at 1391–92.

**69.** "For copolymers having a relatively small amount of non-ethylene component (e.g. 1 to 5%) the variations in density generally reflect differences in percent crystallinity as determined by X-ray methods. For such copolymers a density of 0.91 corresponds with about 50% crystallinity; 0.92, ca. 55%; 0.93, ca. 60%; 0.94, ca. 65%; 0.95, ca. 70%.... The percentage crystallinity of interpolymers containing 1–20% copolymerized higher olefin was such that the density of these interpolymers ranged from 0.95 at 1% to 0.90 at 20% by weight copolymerized higher olefin, the X-ray crystallinity thus falling from 70% at 1% comonomer to 40% at about 20% comonomer. It is to be understood, of course, that these figures are approximate only, since variations can occur in % crystallinity at a fixed level of comonomer content." PX 1, col. 8, *11.* 34–57.

**70.** The Court does not suggest that the crystallinity limitation may be ignored or "read out" of Claim 12.

**71.** Dr. Wilson testified that:

fore, that the densities of the four resins at issue are literally within Claim 12, or in one case is equivalent, and the hoop stress resistances and melt indices meet the claim, further supports the equivalence of the claimed crystallinities and the reported crystallinity values of the four resins at issue.

That DuPont stated during the prosecution of the patent that crystallinities of 32% and 38% were outside of the 40–70% range claimed (DX 724 at 39), does not persuade the Court that the crystallinities at issue here are not substantially equivalent to those claimed. These statements themselves do not control the breadth of equivalents available. *Texas Instruments, Inc.,* 805 F.2d at 1572; *Hughes Aircraft Co.,* 717 F.2d at 1363. Moreover, the lower limit of the claimed range of crystallinities, 40%, serves a different purpose than the 70% limit at issue. The lower limit serves to distinguish the copolymers of the invention from "rubber-like" linear copolymers (Tr. at 859–60), while the upper limit serves to distinguish the copolymers of the invention from ethylene homopolymers. (Tr. at 132.) [72] The Court has not been persuaded that there is any mathematical symmetry between the respective distinctions that the upper and lower limits of the claimed range serve to make. To require mathematical symmetry, for its own sake, between the ranges of equivalents at opposite ends of the claimed range would be to impose an artificial limitation on the breadth of available equivalents. Inventions are appropriated not the several words, or numbers, that describe them. *See Laitram,* 863 F.2d at 857.

The Court finds that each of the crystallinity values for HHM 5502, HHM 5202,

HHM TR–140, and HHM TR–401 is substantially equivalent to those of Claim 12.

### c. *Invention of Claim 12 As a Whole*

Each of the resins HHM 5502, HHM 5202, HHM TR–140 and HHM TR–401 possesses every limitation, or its substantial equivalent, of Claim 12. Furthermore, viewing the invention of Claim 12 as "a whole," *see Hughes Aircraft Co.,* 717 F.2d at 1364; *see also Perkin–Elmer Corp.,* 822 F.2d at 1532–33; *Martin v. Barber,* 755 F.2d 1564, 1568 (Fed.Cir.1985); *Carman Indus., Inc. v. Wahl,* 724 F.2d 932, 942 (Fed.Cir.1983); *Medtronic, Inc. v. Cardiac Pacemakers, Inc.,* 721 F.2d 1563, 1567 (Fed.Cir.1983), the Court finds that the resins, and *a priori* pipe products made from the resins, appropriated the invention. The four resins perform substantially the same function in substantially the same way to yield substantially the same result as the claimed copolymers. They achieved melt processable copolymers with the claimed hoop stress resistance, and the same or a substantially equivalent density and crystallinity, by the addition of higher alpha-olefins to ethylene polymers.[73] To find that Phillips has avoided infringement with resins because the densities or crystallinities varied from the literal description in Claim 12 to the extent at issue here [74] while capturing the advantages of DuPont's discovery would trouble the conscience of this Court.

Accordingly, the Court finds that DuPont has shown by a preponderance of the evidence that HHM TR–130, HHM TR–230, HHM TR–232 Black, HHM TR–232 Yellow, HHM TR–418 Black, HHM TR–418 Orange, 729 Fluff, and 728–01 each infringe Claim 1 of the '698 patent.

---

[I]f I were handed a sample from a polymer that I was unfamiliar with I would define a crystallinity as just being the fraction of area determined as crystalline which is in this case … 61 percent. From the formula I used there it's almost 75 percent. There is a 14 percent spread there. In either case I wouldn't say that I'm dead sure as far as theory that this is a correct crystallinity. (Tr. at 1041.)

**72.** The Court is not persuaded that the prior art with respect to linear homopolymers requires a

finding that the crystallinities at issue are outside of a permissible range of equivalents.

**73.** It is noteworthy that Phillips interchanged resin HHM TR–401 having a crystallinity of 71.4% with resin HHM TR–480 having a crystallinity of 67% in Driscopipe 1000, 6300 and 6400. (Nasser Dep. Tr. at 19, 45, 87–90, 130.)

**74.** Having found *supra* that the density of HHM TR–480 Black was not subtantially equivalent to that claimed, the Court does not refer to it here.

With respect to Claim 12, DuPont has shown that HHM 5502, HHM 5202, HHM TR–140, and HHM TR–401 each infringe under the doctrine of equivalents. However, DuPont has not shown that HHM TR–480 Black infringes literally or under the doctrine of equivalents. Therefore, Phillips directly infringed Claim 12 by making and selling Driscopipe 1000, Driscopipe 6300, Driscopipe 6400, Driscopipe 6500, Driscopipe 3300, Driscopipe 3400, Driscopipe 3700, Driscopipe 3800, and Driscopipe 3900 where these products employed one or more of the foregoing infringing resins. Phillips actively induced infringement by making and selling HHM TR–401, HHM TR–418 Black, and HHM TR–418 Orange.

## V. PERMANENT INJUNCTION

■ This Court previously entered an injunction in this case after trial which permanently enjoined Phillips from continued infringement of the '698 patent. (D.I. 265.) This Court also denied Phillips' motion to stay the injunction pending appeal. *See E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co.*, 659 F.Supp. 92 (D.Del. 1987). This Court's decision notwithstanding, the Federal Circuit granted Phillips' motion to stay "[i]n view of the substantial legal issues presented on appeal, the harm to Phillips, the harm to the public, and the comparative lack of harm to DuPont." *E.I. DuPont de Nemours & Co. v. Phillips Petroleum Co.*, 835 F.2d 277 (Fed.Cir. 1987).

DuPont has again asked the Court to enjoin Phillips from continued infringement of Claims 1 and 12 of the '698 patent. (D.I. 304 at 22.) Therefore, having found infringement of Claims 1 and 12, *see* Section IV.B. *supra*, the Court will consider the propriety of an injunction.

Whether to enter an injunction against future infringement under 35 U.S.C. § 283 is left to the sound discretion of this Court. *Roche Products, Inc. v. Bolar Pharmaceutical Co.*, 733 F.2d 858, 865 (Fed.Cir.), *cert. denied*, 469 U.S. 856, 105 S.Ct. 183, 83 L.Ed.2d 117 (1984). The Court must consider the facts of this case in view of historical equitable principles applicable to injunctions. *See id.* at 865, 867. Thus, the Court must consider the adequacy of DuPont's legal remedy without the issuance of an injunction, irreparable harm, the relative hardships which would befall the parties, and the public interest. *See id.*

The '698 patent issued on February 28, 1978 (PX 1), and, thus, will not expire until 1995. *See* 35 U.S.C. § 154. DuPont will be entitled to bring suit to obtain damages for any infringement that may occur in the future. 35 U.S.C. § 284. But the Court cannot now conclude that this remedy would be adequate in view of the multiplicity of suits that might be necessary over the remaining life of the patent. *Cf. Trans–World Mfg. Corp. v. Al Nyman & sons, Inc.*, 750 F.2d 1552, 1565 (Fed.Cir. 1984) ("Ordinarily an injunction is designed to prevent future infringement, and damages are awarded as compensation for past infringement."); *H.H. Robertson, Co. v. United Steel Deck, Inc.*, 820 F.2d 384, 390 (Fed.Cir.1987) ("The nature of the patent grant ... weighs against holding that monetary damages will always suffice to make the patentee whole, for the principal value of a patent is its statutory right to exclude.").

Ordinarily, a Court should not be reluctant to use its equity powers to ensure a patent owner can protect its right to exclude future infringers. *See Smith Int'l, Inc. v. Hughes Tool Co.*, 718 F.2d 1573, 1581 (Fed.Cir.), *cert. denied*, 464 U.S. 996, 104 S.Ct. 493, 78 L.Ed.2d 687 (1983). Thus, irreparable harm resulting from infringement of a valid patent[75] may be presumed. *See H.H. Robertson, Co.*, 820 F.2d at 390; *Roper Corp. v. Litton Systems, Inc.*, 757 F.2d 1266, 1271 (Fed.Cir.1985); *Smith Int'l*, 718 F.2d at 1581. However, in its order granting Phillips' motion to stay the previous injunction, the Federal Circuit stated that: "harm to DuPont here ...

---

**75.** This Court had only to find that Phillips did not prove that Claims 1 and 12 of the '698 patent were invalid. *See Fromson v. Advance Offset Plate, Inc.*, 755 F.2d 1549, 1555 n. 1 (Fed.Cir. 1985). However, the claims are presumed valid, 35 U.S.C. § 282, and have withstood Phillips' challenges. *See Roper*, 757 F.2d at 1270; *Fromson*, 755 F.2d at 1555 & n. 1.

[was] of a different nature than harm to a patentee who is practicing its invention and fully excluding others," because DuPont "has licensed all willing competitors" and "has announced that it ... [was] in the process of divesting itself of its high density polyethylene resin manufacturing business in the United States." *DuPont,* 835 F.2d at 278.

While the Federal Circuit's statement regarding the harm to DuPont touches the Court's present inquiry to some extent, the harm to DuPont at issue here is distinguishable from that at issue before the Federal Circuit when it was considering the appropriateness of a stay pending appeal. The harm there was that which could befall DuPont if the injunction issued by this Court were stayed pending appeal.[76] By contrast, the Court's inquiry here is with respect to the harm to DuPont's patent rights for the remaining life of the patent.[77] Therefore, although arguably attenuated somewhat in accordance with the reasoning of the Federal Circuit, this Court nonetheless concludes that DuPont's rights will be irreparably harmed by continued infringement.

Next, the relative hardships of the parties must be balanced, considering the public interest. *H.H. Robertson, Co.,* 820 F.2d at 390. Again, the Federal Circuit's calculus in granting the stay is not dispositive. If the injunction is not entered DuPont will be prevented from excluding Phillips from infringing Claims 1 and 12, thus depriving DuPont of "the full enjoyment and protection" of its patent rights. *See Smith Int'l,* 718 F.2d at 1581; *see also H.H. Robertson,* 820 F.2d at 390 ("the principal value of a patent is its statutory right to exclude"). Moreover, DuPont's plans with respect to divesting itself of its resin manufacturing business did not include its pipe, shrink-film, and wire and cable products businesses. (D.I. 277 at 28.)[78]

On the other hand, the hardship to Phillips is attenuated. Whatever merit there may have been to Phillips' contention that the Court's prior injunction would have required Phillips to "fundamentally transform its business," the Court is not persuaded by it here. The Court's prior injunction covered 73 ethylene-hexene copolymers and nine Driscopipe products. Following the Federal Circuit's holding in this case and this Court's disposition on remand, that number has been reduced to 12 copolymers and, at most, nine Driscopipe products where they employ the infringing resins.

Finally, the Court finds that the public interest will be best served if an injunction is entered. There are "many" legitimate licensees of the DuPont patent. (D.I. 306 at 14.) Their interests, as well as that of the public, will be best served if this Court supports the rights of the patentee in this case to prevent unlicensed practice of the invention. Having withstood Phillips' challenges before this Court, the validity of the patent is not, as it apparently was when considered by the Federal Circuit, subject to ripe and ready question.

Therefore, in view of the foregoing the Court will enter an injunction permanently enjoining Phillips, their officers, agents, employees, and licensees, if any, from continuing to infringe, manufacture, use or sell any product which embodies the invention of Claim 1 or 12 of the '698 patent.

## VI. CONCLUSION

Based on the findings of fact and conclusions of law encompassed in this opinion,

---

**76.** The Federal Circuit noted that: "[i]n view of the stay entered herein, if DuPont wishes, the court will entertain a motion to expedite." *DuPont,* 835 F.2d at 279 n. 2. It is also noteworthy that the Federal Circuit's calculus included the prospect that there were "substantial legal questions" regarding this Court's interpretation of the infringed claims. *See id.* at 278. This calculus has no application here.

**77.** It is axiomatic that our patent laws do not grant a patentee the exclusive right to practice his invention, rather the right of the patentee is to exclude others from making, using or selling it. 35 U.S.C. § 154; *see also Bonito Boats, Inc. v. Thunder Craft Boats, Inc.,* — U.S. —, —, 109 S.Ct. 971, 976, 103 L.Ed.2d 118 (1989). Thus, while a patentee's business of practicing his invention may also be harmed by infringement, his right to exclude others is no more harmed because he is practicing it.

**78.** Claim 1 covers copolymers "in the form of a film" and Claim 12 covers copolymers "in the form of a pipe."

the Court will enter a judgment in this case which shall: (1) deny Phillips' motion for summary judgment or in the alternative to reopen the record; (2) adjudge and declare that Phillips has not met its burden of proving by clear and convincing evidence that Claim 1 or 12 of the '698 patent is invalid (a) based on its anticipation references under 35 U.S.C. § 102, or (b) based on obviousness under 35 U.S.C. § 103; (3) adjudge that DuPont has met its burden of proving by a preponderance of the evidence that Phillips has infringed Claim 1 of the '698 patent with eight copolymers: HHM TR–130; HHM TR–230; HHM TR–232 Black; HHM TR–232 Yellow; HHM TR–418 Black; HHM TR–418 Orange; 728 Fluff; and, 728–01; (4) adjudge that Du-Pont has met its burden of showing by a preponderance of the evidence that Phillips has infringed Claim 12 of the '698 patent with seven copolymers: HHM 5502; HHM 5202; HHM TR–140; HHM TR–401; HHM TR–418 Black; HHM TR–418 Orange; and, HHM TR–130; (5) adjudge that DuPont has not met its burden of proving by a preponderance of the evidence that Phillips has infringed Claim 1 or 12 of the '698 patent with copolymer HHM TR–480 Black; (6) order an accounting to determine the damages caused by Phillips' infringement; and (7) enter an injunction permanently enjoining Phillips from continued infringement of Claims 1 and 12 of the '698 patent.

### APPENDIX A

**CLAIM 1.**

An interpolymer composed of interpolymerized comonomers consisting essentially of ethylene and at least one normal aliphatic mono-alpha-olefinic hydrocarbon containing from 5 to 10 carbon atoms per molecule, the proportion of said monoolefinic hydrocarbon being from 3 to 7% of the weight of the interpolymer, said interpolymer having a melt index with the range of 0.3 to 20, and, when in the form of a film, an Elmendorf tear strength in the range of 150 to 400 grams per mil, and a density of 0.93 to 0.94.

**CLAIM 5.** *

An interpolymer of ethylene and a higher olefinic hydrocarbon having 5 to 10 carbon atoms per molecule, said higher olefinic hydrocarbon having one terminal $-CH = CH_2$ per molecule and no other olefinic unsaturation, said interpolymer being further chracterized in that it has an X-ray crystallinity in the range of 40 to 70%, a melt index in the range of 0.3 to 20, a density in the range of 0.9 to 0.95 and said interpolymer being further characterized in that its density is not less than 0.93 unless the content of said higher olefinic hydrocarbon in the interpolymer is at least 3% by weight.

**CLAIM 12.**

Composition of claim 5 in the form of pipe which is further characterized by withstanding 3000 hours at hoop stress of 750 psi and a temprature of 60°C.

### ORDER ON CONSENT

Plaintiff DuPont having moved this Court pursuant to Rules 52(b) and 59(e), F.R.Civ.P., to amend the Court's March 6, 1989 findings and Judgment as to infringement by Phillips' resin HHM TR–480 Black, and defendants having consented to the entry of this Order granting that motion as set forth below, IT IS HEREBY ORDERED that:

1. Plaintiff's motion is granted.

2. The March 6, 1989 findings are hereby amended to find that HHM TR–480 Black is a resin containing carbon Black whose feedstock hexene copolymer resin has a density specification of 0.9500 or less. See 656 F.Supp. at 1386–87 & n. 31.

3. The March 6, 1989 Judgment is hereby amended to delete paragraph 5 and in paragraph 4 to change the phrase "7 copolymers" to read "8 copolymers" and to add "HHM TR–480 Black."

* Claim 5 is not directly at issue on remand but is reproduced here because Claim 12 is dependent on it.

**CONSENT**

Defendants, by their attorneys, hereby consent to the entry of this Order without prejudice to defendants' right to assert on appeal that Claim 12 of the Du Pont '698 patent in suit is invalid.